# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| ASPHALT TRADER LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT SCOTT BEALL and TARYN CAPITAL ENERGY, L.L.C.,<br><br>Defendants. | **FINDINGS OF FACT<br>AND<br>CONCLUSIONS OF LAW**<br><br>Case No.: 1:17-CV-15-HCN-DBP<br><br>Judge Howard C. Nielson, Jr.<br>United States District Judge |

On January 30, 2017, Plaintiff Asphalt Trader Limited brought this action against Defendants Taryn Capital Energy, L.L.C., and Robert Scott Beall. Asphalt Trader initially asserted various claims against Defendants, but after the court granted partial summary judgment for Defendants, the only remaining claim is that Taryn allegedly transferred large sums of money to Mr. Beall or for his benefit with actual intent to hinder, delay, or defraud Asphalt Trader from collecting on a debt owed by Taryn. The court held a bench trial on this remaining claim on December 6–7, 2021, with closing arguments on February 11, 2022.

After carefully considering the evidence and argument presented at trial and in the parties' pre- and post-trial briefing, the court enters the following findings of fact and conclusions of law. Based on these findings and conclusions, the court will enter judgment for Defendants on Asphalt Trader's remaining claim.

**FINDINGS OF FACT**

1.      Before forming Taryn, Mr. Beall worked for about twenty-five years in the petroleum industry with a company called Petro Source. *See* Trial Transcript ("Tr.") at 190:11–20. At all relevant times, Mr. Beall maintained an ownership interest in Petro Source and received monthly payments ranging from zero to as much as $30,000. *See id.* at 113:11–14.

2.      Mr. Beall formed Taryn as a limited liability company under Utah law on March 21, 2006. *See id.* at 193:1–4. Mr. Beall is the sole member and manager of Taryn, and he is the only person authorized to make deposits into or withdrawals from Taryn's bank accounts. *See id.* at 47:5–8, 193:5–11.

3.      At the time of Taryn's formation, Mr. Beall made an initial capital contribution of $1,000. *See id.* at 193:12–24. Under Taryn's Articles of Organization, "[n]o member shall be obligated or liable to make any contribution to capital except in accordance with the specific terms of the operating agreement." Beall Ex. 101 at art. IV. As a result, and in the absence of any provision of the Operating Agreement imposing such an obligation, Mr. Beall did not believe that he was required to make any additional capital contributions beyond his initial investment. *See* Tr. at 194:3–6; *see also* Beall Ex. 102 at art. VIII.

4.      Taryn's Operating Agreement provided a process whereby members could make loans to the company:

> [A] Member may make loans to the Company, which are not capital contributions. If a Member elects to advance funds to the Company after satisfying his initial capital requirement, then, unless a contrary agreement in writing has been made between the Company and the Member or between the Members, such Member's advance shall be deemed to be a loan to the Company and shall bear interest at the rate implied under Utah law or at such higher rate as had been agreed to by the Company. . . . If a Member advances funds to the Company and the Company accepts such advance or fails to timely reject such advance as heretofore described, then unless otherwise agreed in writing between the Member and the Company, such loan indebtedness shall be repaid to the

2

> Member with interest as soon as the Company has reasonable resources for such repayment, but not later than three (3) years from the date of the advance. With respect to loan advances made by a Member, such Member shall stand in the capacity of a creditor of the Company and be treated in the same respect as any other creditor, regardless as to whether or not the debt obligation of the Company is evidenced by a promissory note or evidenced by the terms of this Operating Agreement.

Beall Ex. 102 at art. X.

5.      Mr. Beall maintained Excel sheets recording the deposits, withdrawals, and transfers of money into or out of Taryn's accounts. *See* Tr. at 198:14–19, 331:24–332:6. Mr. Beall also kept bank statements, check registers, canceled checks, transaction summaries, credit card statements, vendor files, and invoices as records of Taryn's transactions. *See id.* at 83:18–25, 118:12–20, 139:14–21, 356:9–357:3.

6.      Shortly after Taryn was created and at all relevant times thereafter, Taryn and Mr. Beall employed Scott Heath ("Mr. Heath") for tax and accounting advice. Mr. Heath is a certified public accountant, and he prepared tax returns for Mr. Beall and assisted Taryn in converting its bookkeeping to QuickBooks. *See id.* at 200:2–23; Asphalt Ex. 26 ¶¶ 1–3.

7.      Jill Sheldon—Mr. Beall's girlfriend—also assisted with Taryn's bookkeeping. *See* Tr. at 355:10–11; 356:1–361:10.

8.      The IRS audited Mr. Beall's 2013 tax return, including the Schedule C for Taryn filed with the return. *See* Beall Ex. 111. Mr. Beall and Mr. Heath provided financial information to the IRS about Taryn for the audit, *see* Tr. at 287:10–288:21, and the IRS ultimately determined that no changes needed to be made to Mr. Beall's tax return or Taryn's Schedule C, *see* Beall Ex. 112.

9.      Because Taryn was a disregarded entity for tax purposes, Mr. Beall (Taryn's sole member) was personally obligated to pay taxes on all of Taryn's income. *See* Tr. at 196:8–197:9.

3

It followed, Mr. Beall testified, that he "had to take [the profits] out—in theory Taryn was a disregarded entity, is what the accountant calls it—and pay tax and then essentially [the profit's] gone then. And if I leave [the profits] in, it's, again, a loan." *Id.* at 196:20–23.

10.     In other words, Mr. Beall understood that after he paid Taryn's business expenses and taxes on Taryn's income each year, any remaining profit belonged to him. *See id.* at 196:8–17. And because he had no obligation to contribute capital beyond his initial $1,000 contribution, Mr. Beall understood that if he did not take Taryn's profit as a distribution but instead left it in Taryn's bank accounts, the money constituted a loan that Taryn was required to repay to him. *See id.* at 196:18–197:9.

11.     Mr. Beall testified that he was not concerned with documenting his loans to Taryn with promissory notes or other formal papers because its Operating Agreement provided that:

> With respect to loan advances made by a Member, such Member shall stand in the capacity of a creditor of the Company and be treated in the same respect as any other creditor, regardless as to whether or not the debt obligation of the Company is evidenced by a promissory note or evidenced by the terms of this Operating Agreement.

Beall Ex. 102 at art. X; *see also* Tr. at 196:24–197:15, 198:4–8, 199:3–14.

12.     Mr. Beall also testified that although he was entitled to do so, he did not charge interest on his loans to Taryn because "it seemed like and was a situation where if I charged interest, I'd have to take that as income and then, you know, deduct it off of my Schedule Cs, which taxwise would have been a wash sometimes." Tr. at 199:7–11.

13.     Taryn's accounting records indicate that from at least January 3, 2012, through December 31, 2016, Mr. Beall and Taryn engaged in a course of dealing, with "Mr. Beall depositing his income from outside sources into Taryn's checking accounts and Taryn paying many of Mr. Beall's personal expenses from that account, on a remarkably consistent basis."

56(g) Order, Dkt. No. 185 ¶ 1; *see also* Beall Ex. 114. At trial, Mr. Beall testified that Taryn and he did not significantly deviate from their "normal course of business." Tr. at 345:6–12.

14.     "For most of this period, Mr. Beall deposited his outside income into Taryn's accounts and Taryn paid Mr. Beall's personal expenses, and the amounts deposited by Mr. Beall and the amounts paid by Taryn were generally consistent." 56(g) Order, Dkt. No. 185 ¶ 2.

15.     Many of the payments were to various third parties, such as credit card companies and utility companies. *See id.* ¶ 8.

16.     Mr. Beall testified that he considered his deposits of outside income to be loans to Taryn and Taryn's payment of his personal expenses to be repayment of those loans. *See* Tr. at 132:11–133:2, 295:11–298:25.

17.     Mr. Heath maintained a loan ledger in QuickBooks recording personal and family funds deposited by Mr. Beall into Taryn's bank accounts, profits left in those bank accounts and not distributed to Mr. Beall after he paid taxes on them, and payments made from Mr. Beall's personal accounts for Taryn's business expenses. *See* Beall Ex. 114. All of these were characterized as loans from Mr. Beall to Taryn. *See id*. This ledger also recorded all of the payments made by Taryn to Mr. Beall or for his personal expenses. *See id.* These payments were characterized as loan repayments. *See id.*; *see also* Tr. at 155:11–156:9. The ledger thus allowed Defendants to determine the running total of the loan balance owed by Taryn to Mr. Beall. *See* Beall Ex. 114; Tr. at 297:10–24.

18.     It is undisputed that Asphalt Trader is a corporation registered in Liberia. *See* Dkt. No. 2 ¶ 2. Asphalt Trader is affiliated with a company known as Eurotankers, and either Asphalt Trader or Eurotankers owns a ship known as the *Asphalt Trader*. *See* Tr. at 216:20–218:11; *see*

*also* Beall Ex. 172. For convenience, the court will refer to the owner to this ship as Asphalt Trader.

 **19.** Beginning in March 2009, Taryn engaged in nine successful transactions with Asphalt Trader. *See* Tr. at 319:23–320:1; *see also* Beall Exs. 103, 105.

 **20.** For each of these transactions, Taryn sub-chartered the *Asphalt Trader* to a third party. *See* Tr. at 222:6–19. Each time, the charter agreements between Taryn and Asphalt Trader were "back-to-back" with the corresponding sub-charter agreement between Taryn and the third-party, meaning the charter agreement and related sub-charter agreement contained the same terms. *See id.* at 222:13–19; *see also* Beall Ex. 117.

 **21.** Mr. Beall characterized Taryn's role in these transactions as a "middle person" who brought together Asphalt Trader and sub-charterers who wished to use its ship to transport petroleum products. Tr. at 228:2–4.

 **22.** Mr. Beall testified that his understanding was that no payments were due under any of these charter or sub-charter agreements until the ship was loaded. *See id.* at 223:13–16; *see also* Beall Exs. 103, 117. Mr. Beall also testified that his understanding matched the parties' course of dealing: in all of the nine transactions, Taryn was never paid by the sub-charterers— and Taryn never paid Asphalt Trader—before the ship was loaded. *See* Tr. at 223:13–224:4, 228:5–11. And Mr. Beall testified that, as a course of dealing reflecting the back-to-back contracts, Taryn never paid Asphalt Trader before the sub-charterer paid Taryn. *See id.*

 **23.** In all of these nine transactions, the *Asphalt Trader* was successfully loaded, the sub-charterer paid Taryn, and Taryn in turn paid Asphalt Trader. *See id.*

 **24.** Taryn subsequently entered into a contract for a tenth transaction with Asphalt Trader. This contract involved transporting fuel oil to be loaded at a port in Venezuela in April

2012. *See* Beall Ex. 104 at 1. Mr. Beall testified that, as before, the agreement did not require payment until the ship was actually loaded. *See* Tr. at 236:22–237:6.

25.      Without objection from Asphalt Trader, Taryn substituted Cinque Terre for Latina Oil, the initial sub-charterer. *See id.* at 239:7–9. And once again, the sub-charter agreement between Taryn and Cinque Terre was back-to-back with the charter contract between Asphalt Trader and Taryn. *See id.* at 237:20–238:4; Beall Ex. 106.

26.      It followed, Mr. Beall testified, that no payment would be due from Cinque Terre to Taryn until the ship was loaded. *See* Tr. at 238:20–239:4; Beall Ex. 106.

27.      Asphalt Trader was aware of Taryn's sub-charter agreement with Cinque Terre and communicated directly with Cinque Terre personnel, including Mark Walker, about the fulfillment of the charter agreements. *See* Tr. at 239:10–240:1. Cinque Terre, in turn, spoke directly with the captain of the *Asphalt Trader*, as well as Michael Gotsis, a representative of Asphalt Trader. *See id.* at 244:4–8.

28.      Although the *Asphalt Trader* successfully arrived at the port, for reasons that are still not fully understood, the Venezuelan government never allowed the ship to be loaded. *See id.* at 254:17–255:2.

29.      Although Asphalt Trader did not have a "direct contract" with Cinque Terre, *id.* at 335:13–336:6, Asphalt Trader's lawyers sent an email to both Taryn and Cinque Terre on June 22, 2012, asserting that both entities were responsible for Asphalt Trader's "continuing and ever-increasing claim for damages for detention." Beall Ex. 132; *see also* Tr. at 340:23–341:19.

30.      At trial, Mr. Beall acknowledged that he understood, as of that date, that Asphalt Trader would likely bring a claim for damages against Taryn. *See* Tr. at 341:20–24.

31.     Both Cinque Terre and Taryn took the position that no payment was due under the sub-charter agreement or the charter agreement because the *Asphalt Trader* had not been loaded. *See id.* at 146:1–19; 255:3–9.

32.     Thus, when Mr. Beall asked Mark Walker in June 2012 whether Cinque Terre would pay Taryn for breach of the sub-charter agreement, Mark Walker "said that everything was out of his hands, that they were going to go by the contract, and they would see Taryn in court." *Id.* at 66:18–20.

33.     On October 18, 2012, Asphalt Trader initiated arbitration proceedings against Taryn. *See* Asphalt Ex. 6. Taryn, in turn, asserted a claim against Cinque Terre in the same proceeding. *See* Tr. at 262:16–25. Both Taryn and Cinque Terre asserted the same defense—that no payment was due because the *Asphalt Trader* was never loaded. *See id.* at 146:13–147:21, 262:12–15.

34.     During the ensuing settlement discussions between the parties, Asphalt Trader appears to have blamed Cinque Terre for the problems that occurred with the transaction. In one conversation, the owner of Asphalt Trader, Elias Gotsis, reassured Mr. Beall by stating: "this is not your problem, you are not at fault here. We'll get this straight." *Id.* at 362:22–23. And in fact, Asphalt Trader appears to have negotiated directly with Cinque Terre in its attempts to resolve the dispute. *See id.* at 264:1–11.

35.     Mr. Beall testified that as a result of this conversation and the back-to-back nature of the chartering agreements, he was not concerned with the eventual result of the arbitration proceeding. *See id.* at 146:1–19, 264:12–14. In particular, Mr. Beall believed that either Taryn would prevail on the ground that no payment was due unless the ship was loaded—or, if Asphalt Trader prevailed, Taryn would receive an offsetting award against Cinque Terre because Cinque

Terre's defense against Taryn tracked Taryn's defense against Asphalt Trader and because the payment to be made by Cinque Terra under the sub-charter agreement was slightly larger than the payment to be made by Taryn under the charter agreement. *See id.* at 71:14–21; 255:3–9, 263:13–23, 264:12–14, 269:11–21.

36.     Once the arbitration proceedings began, and after conducting some research, Mr. Beall believed Cinque Terre had the financial ability to pay an offsetting award to Taryn. *See id.* at 270:16–271:5. In particular, Mr. Beall obtained bank records and trade references indicating that Cinque Terre had a seven- to eight-figure balance at Banco Popular. *See id.* at 64:24–65:8. Mr. Beall also learned that Cinque Terre had extensive business activities, including product shipments, *see id.* at 65:9–16, and that Cinque Terre's "financial officer . . . referenced around $30 million between three of Cinque Terre's companies," *id.* at 270:12–15.

37.     For these reasons, from 2012 through 2016, Taryn listed as an asset on its balance sheet its claim against Cinque Terre—"a claim . . . that was more than adequate to offset Asphalt Trader's claim against Taryn." 56(g) Order, Dkt. No. 185 ¶ 10; *see also* Tr. at 70:25–71:4.

38.     On February 12, 2016, the arbitration proceeding resulted in an award for Asphalt Trader against Taryn, and an award for Taryn against Cinque Terre. *See* Beall Ex. 107.

39.     Cinque Terre has not paid the award to Taryn, and Taryn has not paid the award to Asphalt Trader. *See* Tr. at 64:3–23.

40.     This court confirmed Asphalt Trader's arbitration award against Taryn on December 1, 2016. *See* Case No. 1:16-cv-54.

41.     Mr. Beall was not a party to the proceeding to confirm the arbitration award.

42.     On June 21, 2016, an order for relief was entered in bankruptcy for Cinque Terre. *See* Tr. at 273:15–18.

9

43.     Mr. Beall testified that he did not learn of Cinque Terre's bankruptcy proceedings until early December 2016. *See id.* at 272:2–23. The court credits this testimony, which is corroborated by a filing made by Taryn's attorney in Cinque Terre's bankruptcy case on December 8, 2016, in which Taryn asserted its claim against Cinque Terre and attempted to collect at least some portion of a recent $14 million shipment made by Cinque Terre. *See id.* at 150:4–151:5.

44.     Mr. Beall also testified that even after he learned of Cinque Terre's bankruptcy, he still believed he might be able to recover at least some portion of his award against Cinque Terre. *See id.*

45.     Taryn's historical operating expenses were about $40,000 a year. *See id.* at 283:2–5. From 2012 through 2016, however, Taryn expenses were even greater as a result of legal fees incurred arbitrating and then litigating Taryn's dispute with Asphalt Trader. *See id.* at 283:6–13.

46.     Taryn had income of about $368,000 in 2012 from its participation in a single transaction involving Phillips 66 and a European company. *See id.* at 280:13–24; Beall Ex. 124. Taryn did not generate any additional business income after that deal, however. *See* Tr. at 59:20–23.

47.     Although Taryn incurred increased business expenses without generating any income, Mr. Beall continued to deposit "his outside income into Taryn's accounts and Taryn paid Mr. Beall's personal expenses, and the amounts deposited by Mr. Beall and the amounts paid by Taryn were generally consistent" with the transactions carried out between the two Defendants when Taryn was more profitable. 56(g) Order, Dkt. No. 185 ¶ 2.

48.     Mr. Beall testified that because of the "amount of [his] experience in the petroleum industry," he believed throughout this four-year period that his business would

eventually become profitable again. Tr. at 135:19–25.  Mr. Beall further testified that "[i]t didn't ever look like Taryn was no longer viable" and that he kept "trying to do business every day" during this period. *Id.* at 135:5–6. Mr. Beall also continued to prepare and file Schedules C for Taryn with his annual tax returns. *See* Beall Ex. 110.

49.     Mr. Beall testified that in order "to show an active account" despite Taryn's lack of current business, he continued his pattern of depositing into Taryn's bank accounts his Petro Source income as well as other personal and family funds. Tr. at 113:4–114:23. All of this money belonged to Mr. Beall; Taryn had no claim or right to it. *See id.*  Mr. Beall also continued to pay personal expenses from Taryn's accounts. *See* 56(g) Order, Dkt. No. 185 ¶ 2. Mr. Beall testified that he continued to consider his deposits of income to be loans to Taryn and Taryn's payments of his personal expenses to be repayments of those loans. *See* Tr. at 132:11–133:2, 295:11–298:25.

50.     Mr. Beall testified that he sought to show an active account so that Taryn could potentially qualify for a line of credit, which might prove necessary if a business opportunity arose. *See* Tr. at 114:4–7. According to Mr. Beall, "I was anticipating, you know, needing Taryn to have assets to be able to proceed going forward, or the wherewithal to be able to proceed going forward." *Id.* at 284:6–8.

51.     Despite Mr. Beall's deposits, the balance in Taryn's bank accounts decreased each year from 2013 through 2016. *See id.* at 60:3–8.

52.     In 2013, the balance decreased by $113,993.29. *See id.* at 61:10–11.

53.     In 2014, the balance decreased by $92,795.40. *See id.* at 61:12–13.

54.     In 2015, the balance decreased by $117,203.96. *See id.* at 61:14–15.

55.     And in 2016, the balance decreased by $117,091.83. *See id.* at 61:20–21.

11

56.     Notwithstanding the decreasing balance in Taryn's bank accounts, Mr. Beall testified that Taryn had adequate funds to pay its operating expenses from 2012 to 2016. *See id.* at 283:9–13.

57.     All told, the balance in Taryn's bank accounts decreased from approximately $441,837 in June 2012 to essentially zero by December 31, 2016. *See* 56(g) Order, Dkt. No. 185 ¶ 3; *see also* Asphalt Exs. 3, 4.

58.     Over this period, Taryn spent $1,865,870 for Mr. Beall's personal expenses and other expenses unrelated to its business—including payments for Mr. Beall's personal phone, internet, television, credit card, mortgage, car insurance, and utility bills. *See* Beall Ex. 122; Tr. at 52:15–55:22.

59.     Taryn spent $103,529 of this amount after the arbitration award in February 2016, including $22,834 after the order for relief in bankruptcy was entered for Cinque Terre on June 21, 2016, and $5,177 after Mr. Beall learned of Cinque Terre's bankruptcy in early December 2016. *See* Beall Exs. 118, 120, 122 at 11.

60.     Conversely, between June 2012 and December 2016, Mr. Beall provided Taryn $1,717,666 of his own money. *See* 56(g) Order, Dkt. No. 185 ¶ 3; Beall Ex. 114. The vast majority of this money was deposited into Taryn's bank accounts, though Mr. Beall paid some of Taryn's bills directly, including legal fees relating to the arbitration proceedings.  *See* Beall Ex. 114 at 25; Beall Ex. 119 at 1; Tr. at 128:20–129:14, 282:9–283:1, 299:18–300:10, 303:10–18.

61.     Mr. Beall provided $121,271 of this amount after the arbitration award in February 2016, including $49,390 after the order for relief in bankruptcy was entered for Cinque Terre on June 21, 2016, and $21,931 after Mr. Beall learned of Cinque Terre's bankruptcy in early December 2016. *See* Beall Exs. 119, 120, 121.

62. Mr. Beall also engaged in a number of financial transactions with his own assets after the arbitration award was entered.

63. First, on November 14, 2016, Mr. Beall signed a quitclaim deed transferring title to his personal residence to the Stone Canyon River Asset Protection Trust. *See* Tr. at 105:17–23, 106:9–12; Asphalt Ex. 19. The trustees of this trust are Mr. Beall and his stepdaughter, Alexandra Britt Zeisler. *See* Tr. at 106:22–25; Asphalt Ex. 19.

64. Second, on December 30, 2016, Mr. Beall transferred a residential vacant lot to the Rim to River Asset Protection Trust. *See* Tr. at 100:6–25; Asphalt Ex. 18. Mr. Beall and his stepdaughter Alexandra Britt Zeisler are the trustees of this trust, which Mr. Beall understood would "protect . . . assets from liens, encumbrances, [and] creditors." Tr. at 101:8–13, 102:19–103:5.

65. The vacant lot ultimately sold for $1,074,279, $600,000 of which is still held by the trust. *See id.* at 103:14–22, 104:5–12; Asphalt Ex. 18.

66. Third, Mr. Beall formed Three Canyon, L.L.C. on August 16, 2016. *See* Tr. at 109:22–110:13; Asphalt Ex. 20. Mr. Beall is the only member of this company. *See* Tr. at 111:5–12; Asphalt Ex. 20.

67. On August 16, 2016, Mr. Beall transferred his interest in his income from Petro Source to Three Canyon, L.L.C. *See* Tr. at 112:20–113:6.

68. Mr. Beall testified that none of these transfers were made with the intent to prevent Asphalt Trader from collecting against Taryn. *See id.* at 157:1–159:24, 320:14–17. To the contrary, he testified that they were part of his estate planning. *See id.* at 101:24–102:10. Mr. Beall testified that he better appreciated the need for careful estate planning after he encountered problems winding up the affairs of his mother and sister, both of whom passed away intestate or

with very little estate planning, and that he made these transfers when his own health began to

falter. *See id.* at 315:4–316:4.

## CONCLUSIONS OF LAW

At all relevant times, the allegedly fraudulent transfers were governed by Utah's Uniform

Fraudulent Transfer Act, Utah Code §§ 25-6-1 to 14 ("UFTA").[1] Under Section 25-6-5(1)(a),

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor,
> whether the creditor's claim arose before or after the transfer was made or the
> obligation was incurred, if the debtor made the transfer or incurred the
> obligation . . . with actual intent to hinder, delay, or defraud any creditor of the
> debtor.

Section 25-6-5(2) further provides that

> [t]o determine "actual intent" under Subsection (1)(a), consideration may be
> given, among other factors, to whether:
>
> > (a) the transfer or obligation was to an insider;
> >
> > (b) the debtor retained possession or control of the property transferred
> > after the transfer;
> >
> > (c) the transfer or obligation was disclosed or concealed;
> >
> > (d) before the transfer was made or obligation was incurred, the debtor had
> > been sued or threatened with suit;
> >
> > (e) the transfer was of substantially all the debtor's assets;
> >
> > (f) the debtor absconded;
> >
> > (g) the debtor removed or concealed assets;
> >
> > (h) the value of the consideration received by the debtor was reasonably
> > equivalent to the value of the asset transferred or the amount of the
> > obligation incurred;
> >
> > (i) the debtor was insolvent or became insolvent shortly after the transfer
> > was made or the obligation was incurred;
> >
> > (j) the transfer occurred shortly before or shortly after a substantial debt
> > was incurred; and

---

[1] Utah's Uniform Fraudulent Transfer Act was subsequently amended, renumbered, and
renamed the Uniform Voidable Transactions Act on May 9, 2017—after all of the events at issue
in this case took place. *See* 2017 Utah Laws Ch. 204 (S.B. 58).

(k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Because "the facts which are recognized indicia of fraud are numerous, and no court could pretend to anticipate or catalog them all," the badges of fraud enumerated in the statute are not exhaustive. *Territorial Sav. & Loan Ass'n v. Baird*, 781 P.2d 452, 463 (Utah Ct. App. 1989) (cleaned up). Rather, they are to be considered "among other factors" in determining whether challenged transfers were made with actual intent to hinder, delay, or defraud. Utah Code § 25-6-5(2).

The UFTA treats all transfers made with "actual intent to hinder, delay, or defraud" as "fraudulent." Utah Code § 25-6-5(1). "And under Utah law, a claim of fraud must be proven by clear and convincing evidence." *Jones v. Mackey Price Thompson & Ostler*, 469 P.3d 879, 890 (Utah 2020) (interpreting the UFTA). To succeed on its claim under Section 25-6-5(1)(a), Asphalt Trader must thus satisfy this demanding burden of proof, one that "approaches that degree of proof required in a criminal case." *Lovett v. Continental Bank & Trust Co.,* 286 P.2d 1065, 1067 (Utah 1955).

Even so, "[t]he UFTA requires only that a debtor have intent to hinder or delay, not necessarily intent to defraud." *Hart v. Connected Wireless, Inc.*, No. 2:17-CV-186-TS, 2020 WL 6710426, at *12 (D. Utah Nov. 16, 2020). The Utah Supreme Court has held, moreover, that "there is no requirement that the intent to hinder, delay, or defraud be the sole or even primary motive of the defendant." *Jones*, 469 P.3d at 889. Rather, "a 'mixed motive' is sufficient to establish an 'actual intent' to hinder, delay, or defraud." *Id.*

After carefully considering the evidence and argument offered with respect to the enumerated badges of fraud—as well as certain non-enumerated but relevant factors—the court concludes that Asphalt Trader has failed to establish, by clear and convincing evidence, that

Defendants made the challenged transfers with actual intent to hinder, delay, or defraud. The court will accordingly enter judgment for Defendants on Asphalt Trader's actual fraud claim.

## I.

The court begins with the badges of fraud enumerated in the statute.

### A.

There is no dispute that four of the enumerated badges of fraud do not support Asphalt Trader's claim of actual fraud, and that two of the enumerated badges do provide at least some support for that claim.

First, Asphalt Trader did not argue or present any evidence at trial that Defendants absconded; concealed or removed any assets or transactions; or transferred essential business assets to a lienor, who in turn transferred those assets to an insider. The court accordingly finds that Utah Code §§ 25-6-5(2)(c), (f), (g), and (k) provide no support for Asphalt Trader's claim.

Conversely, Defendants concede that "Beall was an insider of Taryn," Dkt. No. 197 at 29, and thus that the challenged transfers were to (or for the benefit of) an insider. Defendants also concede that "many of the transfers were made to Beall or to third parties for his benefit after Taryn was sued or threatened with suit." Dkt. No. 198 at 25. The court thus finds that Utah Code §§ 25-6-5(2)(a) and (d) provide support for Asphalt Trader's claim.

### B.

The parties do dispute whether "the debtor retained possession or control of the property transferred after the transfer." Utah Code § 25-6-5(2)(b).

Asphalt Trader argues that "[t]he evidence, including Taryn's bank statements, demonstrates *Beall* retained possession or control of the funds transferred both before and after the Fraudulent Transfers were made." Dkt. No. 196 at 26 (emphasis added).

16

But "the debtor" here is *Taryn*, not Mr. Beall. Asphalt Trader seeks to set aside transfers made by Taryn—not Mr. Beall—and it does so pursuant to Section 25-6-5(1)(a), which permits a creditor to challenge "[a] transfer made . . . by *a debtor*." *Id.* (emphasis added). Also, under the UFTA, a debtor is "a person who is liable on a claim," Utah Code § 25-6-2(6), and Asphalt Trader's claim for breach of contract was against Taryn, not Mr. Beall.

Based on the evidence presented at trial, the court finds that Asphalt Trader has failed to establish that *Taryn* retained possession or control of property transferred to Mr. Beall or for his benefit. To the contrary, a great many of the challenged transfers were made to various third parties, such as internet, credit card, and utility companies. *See* Finding of Fact 15; Tr. at 52:15–55:21. And even if some of the transfers were made directly to Mr. Beall, Asphalt Trader has failed to prove that Taryn retained possession or control of the transferred funds.

The court thus finds that Section 25-6-5(2)(b) does not support Asphalt Trader's claim.

## C.

The next disputed badge of fraud is whether "the transfer was of substantially all the debtor's assets." Utah Code § 25-6-5(2)(e).

On the one hand, the evidence presented at trial shows that the balance in Taryn's bank accounts decreased from approximately $441,837 in June 2012, to essentially zero by December 31, 2016. *See* Asphalt Exs. 3, 4. On the other hand, the individual transfers were for relatively small amounts and continued "on a remarkably consistent basis for almost five years." Rule 56(g) Order, Dkt. No. 185 ¶ 1; *see also* Finding of Fact 13.

The court ultimately finds that although in some respects Section 25-6-5(2)(e) supports Asphalt Trader's claim, in other respects, it undermines that claim.

**D.**

The parties also dispute whether "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." Utah Code § 25-6-5(2)(h).

According to Asphalt Trader, "there was no consideration of equivalent value of the funds Beall transferred to himself because Taryn's account balances were depleted . . . without receiving a collectible asset of equivalent value to replace it." Dkt. No. 196 at 31. The UFTA, however, states that "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred *or an antecedent debt is secured or satisfied*." *Id.* § 25-6-4(1) (emphasis added). Asphalt Trader's argument that Taryn could not have received reasonably equivalent value for the funds transferred to Mr. Beall or for his benefit unless it received in exchange "a collectible asset of equivalent value to replace it" would read the second half of this provision out of the statute. It follows that Taryn did receive "reasonably equivalent value" for the challenged transfers if they were made to satisfy "an antecedent debt."

The court finds that the evidence and testimony offered at trial clearly established that Mr. Beall deposited into Taryn's bank accounts large sums of personal and family money to which Taryn had no legal claim. The evidence and testimony also clearly established that despite paying annual taxes on Taryn's income, Mr. Beall did not immediately distribute the remaining profit to himself—as he was legally entitled to do given Taryn's status as a disregarded entity—but instead left the profit in Taryn's bank accounts.

Mr. Beall testified that it was his understanding that when he deposited personal or family funds into Taryn's bank accounts or declined to take distributions to which he was entitled, he was lending money to Taryn. *See* Findings of Fact 9–17. And the court concludes

18

that Mr. Beall's understanding is supported by Utah law and the terms of Taryn's Articles of Organization and Operating Agreement.

Utah law requires that "[a] limited liability company shall reimburse a member for an advance to the limited liability company beyond the amount of capital the member agreed to contribute." Utah Code § 48-3a-407(6). And Utah law treats such an advance as "a loan to the limited liability company." *Id.* § 48-3a-407(7) (cleaned up).

Under Taryn's Articles of Organization, Mr. Beall was required to make an initial capital contribution, which he did at the time of Taryn's formation. *See* Finding of Fact 3. The Articles of Organization made clear, however, that "[n]o member shall be obligated or liable to make any contribution to capital except in accordance with the specific terms of the operating agreement." *Id.* Taryn's Operating Agreement, in turn, provided that "[i]f a Member elects to advance funds to the Company after satisfying his initial capital requirement, then, unless a contrary agreement in writing has been made between the Company and the Member or between the Members, such Member's advance shall be deemed to be a loan to the Company." Finding of Fact 4.

Asphalt Trader does not dispute that Mr. Beall deposited personal and family funds into Taryn's bank accounts and declined to take distributions after paying taxes on Taryn's income. But it argues that the funds that Mr. Beall transferred or left with Taryn could not have constituted loans because they were not evidenced by promissory notes, loan statements, payment terms, interest rates, or amortization schedules.

The court rejects this argument. Both Utah law and the Operating Agreement establish that funds advanced to Taryn in excess of the required capital contribution automatically constituted loans, and neither Utah law nor the Operating Agreement require the types of formalities that Asphalt Trader would demand. Mr. Beall thus reasonably believed, as he

testified, that the Operating Agreement obviated the need for such traditional markings of a loan. *See* Finding of Fact 11. Indeed, the Operating Agreement expressly provided that "[w]ith respect to loan advances made by a Member, such Member shall stand in the capacity of a creditor of the Company and be treated in the same respect as any other creditor, regardless as to whether or not the debt obligation of the Company is evidenced by a promissory note or evidenced by the terms of this Operating Agreement." Finding of Fact 4.

Asphalt Trader also argues that the funds that Mr. Beall transferred or left with Taryn could not have constituted loans to Taryn because Taryn did not pay interest on the purported loans and because Taryn did not repay the purported loans within three years.

To be sure, Utah law provides that payments or advances to a limited liability company that exceed the required capital contribution "accru[e] interest from the date of the payment or advance." Utah Code § 48-3a-407(7). But Asphalt Trader has not identified any provision of Utah law that prohibits members making such payments or advances from waiving the interest to which they are entitled. And Mr. Beall explained at trial that because Taryn was a disregarded entity for tax purposes, any interest payments from Taryn to Mr. Beall would be a pointless formality: on the one hand, Mr. Beall could deduct the interest payments on his Schedule C (because those payments would be a business expense for Taryn), but on the other hand, he would have to report the interest payments as personal income. *See* Finding of Fact 12. The result would be, as he explained, "a wash." *Id.*

Asphalt Trader is also correct that the Operating Agreement contemplated that absent "a contrary agreement in writing," any loans from a Member to Taryn "shall bear interest at the rate implied under Utah law or at such higher rate as had been agreed to by the Company" and "shall be repaid to the Member with interest as soon as the Company has reasonable resources for such

20

repayment, but not later than three (3) years from the date of the advance." Finding of Fact 4. The court concludes, however, that Defendants' evident failure to comply with these requirements does not establish that the funds Mr. Beall provided or left with Taryn were not loans. Immediately after stating these requirements, the Operating Agreement goes on to provide that "[w]ith respect to loan advances made by a Member, such Member shall stand in the capacity of a creditor of the Company and be treated in the same respect as any other creditor, *regardless as to whether or not the debt obligation of the Company is* evidenced by a promissory note or *evidenced by the terms of this Operating Agreement*." *Id.* (emphasis added). In other words, a member's advance is treated as a loan even if it does not comply with—and thus is not "evidenced by"—the terms of the Operating Agreement.

The court accordingly finds that the payments from Taryn to Mr. Beall or on his behalf were reasonably characterized as loan repayments from which Taryn benefited by a reduction in its debt to Mr. Beall. Because Taryn thus received "reasonably equivalent value" for the challenged transfers through the satisfaction of "an antecedent debt," Utah Code § 25-6-4(1), the court finds that Section 25-6-5(2)(h) undermines Asphalt Trader's claim.

**E.**

The court turns next to whether "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred." Utah Code § 25-6-5(2)(i).

Under the UFTA, a "debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." *Id.* § 25-6-3(1). In addition, a "debtor who is generally not paying his debts as they become due is presumed to be insolvent." *Id.* § 25-6-3(2).

Although Asphalt Trader presented evidence relating to its claim for breach of contract against Taryn and the arbitration award ultimately entered in its favor on this claim, Asphalt

Trader did not provide any evidence regarding the fair valuation of Taryn's assets or its other liabilities that would enable the court to assess Taryn's balance-sheet solvency. And while Asphalt Trader did have a claim for breach of contract against Taryn that would have counted as a debt on Taryn's balance sheet, Taryn had a corresponding claim for breach of contract against Cinque Terre "that was more than adequate to offset Asphalt Trader's claim against Taryn," and which would have counted as an asset on Taryn's balance sheet. Finding of Fact 37.

Asphalt Trader argues that because Taryn's claim against Cinque Terre was disputed and, prior to the arbitration award, had not been reduced to judgment, it was a "fictional paper asset" that "could never help Taryn pay its debts because it was worth nothing" and therefore should be disregarded in determining whether Taryn's debts exceeded its assets. Dkt. No. 196 at 34. But of course, Asphalt Trader's claim against Taryn was also disputed (on the same grounds) and, prior to the arbitration award, had also not been reduced to judgment. At least before bankruptcy relief was entered for Cinque Terre in June 2016, there is simply no basis for treating Asphalt Trader's claim against Taryn differently from Taryn's claim against Cinque Terre for purposes of determining Taryn's balance-sheet solvency.

While it may have been possible for Asphalt Trader to establish that Taryn was balance-sheet insolvent *after* Cinque Terre's bankruptcy, Asphalt Trader failed to provide evidence that would permit a finding that Taryn's debt to Asphalt Trader exceeded its assets. For example, Asphalt Trader provided no evidence that would provide a basis for determining how much Taryn's debt against Cinque Terre should be written down as a result of the bankruptcy proceedings, or evaluating how much Taryn's assets (including intangible assets, such as good will) were worth.

In all events, relatively few of the challenged transfers occurred after June 21, 2016, when the order for relief was entered in bankruptcy for Cinque Terre. *See* Finding of Fact 42. In fact, Mr. Beall paid more than twice as much of his own money for Taryn's expenses as Taryn paid for Mr. Beall's personal expenses after this date. *See* Findings of Fact 57–61 (finding that after June 21, 2016, Taryn spent $22,834 for Mr. Beall's benefit, but Mr. Beall spent $49,390 of his personal funds for Taryn's business expenses).

The court also finds that Asphalt Trader failed to demonstrate that Taryn should be presumed insolvent for failing to pay its debts as they became due prior to Mr. Beall's learning of Cinque Terre's bankruptcy proceedings in early December 2016. Indeed, Asphalt Trader may have failed to demonstrate that this presumption should apply at all.

Although Asphalt Trader argues that the presumption should apply because Taryn did not pay damages to Asphalt Trader immediately after the claimed breach of contract, the Official Commentary to the UFTA makes clear that "[a] presumption of insolvency does *not* arise from nonpayment of a debt as to which there is a genuine bona fide dispute, even though the debt is a substantial part of the debtor's indebtedness." Dkt. No. 86-21 at 14 (emphasis added). As explained, Taryn disputed its liability and argued, based on the language of the charter agreement and the parties' course of dealing, that it was not obligated to pay Asphalt Trader because the ship was never loaded. *See* Findings of Fact 22–24. Under these circumstances, there is no warrant to presume that Taryn was insolvent simply because it did not pay a disputed liability prior to the arbitration award.

Given that the arbitrators not only awarded Asphalt Trader damages against Taryn, but also awarded Taryn offsetting damages against Cinque Terre, it is also not particularly surprising that Taryn delayed paying Asphalt Trader until it was paid by Cinque Terre—at least until Mr.

Beall learned of Cinque Terre's bankruptcy in early December 2016. After all, Mr. Beall testified that under the parties' established course of dealing, Taryn never paid Asphalt Trader until it was first paid by the sub-charterer. *See* Finding of Fact 22.

The Official Commentary to the UFTA contemplates that in addressing the presumption of insolvency based upon the nonpayment of debts, courts may consider "the existence of . . . other special circumstances alleged to constitute an explanation for the stoppage of payments." Dkt. No. 86-21 at 14. The court concludes that the existence of Taryn's offsetting award against Cinque Terre and the parties' course of dealing are "special circumstances" that render unreasonable any presumption of insolvency based on Taryn's failure to pay the arbitration award to Asphalt Trader before it learned of the bankruptcy proceedings involving Cinque Terre in early December 2016.

Very few of the allegedly fraudulent transfers occurred after Mr. Beall learned of Cinque Terre's bankruptcy in early December 2016. Indeed, Mr. Beall spent four times more of his own money for Taryn's expenses than Taryn spent for Mr. Beall's personal expenses after that date. *See* Findings of Fact 57–61 (finding that beginning in early December 2016, Taryn spent $5,177 for Mr. Beall's benefit and Mr. Beall spent $21,931 of his personal funds for Taryn's business expenses).[2]

Finally, given that the statutory presumption of insolvency applies to a "debtor who is *generally* not paying his debts as they become due," Utah Code Ann. § 25-6-3(2) (emphasis added), Taryn's failure to pay a *single* debt—damages to Asphalt Trader—may well be insufficient to trigger this presumption at all.

---

[2] For essentially the same reasons, the court rejects the argument that Mr. Beall's failure to make any payments to Asphalt Trader after the arbitration award issued is a non-statutory factor that substantially supports the actual fraud claim.

For all of these reasons, the court finds that this badge of fraud provides little if any support for Asphalt Trader's claim of actual fraud.[3]

**F.**

The last disputed badge of fraud set forth in the statute is whether "the transfer occurred shortly before or shortly after a substantial debt was incurred." Utah Code § 25-6-5(2)(j).

Under the UFTA "'Debt' means liability on a claim." *Id.* § 25-6-2(4). And a "'[c]laim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 25-6-2(3). It follows that Taryn incurred a debt as soon as Asphalt Trader's claim for breach of contract arose in April 2012, even though the claim was "disputed" and not "reduced to judgment" until February 2016. And the court has little doubt that the debt was "substantial" within the meaning of the statute.

This badge of fraud, however, applies only to transfers made "*shortly before or shortly after* a substantial debt was incurred." Utah Code § 25-6-5(2)(j) (emphasis added). Here, Asphalt Trader challenges numerous transfers made over the course of more than four years. While some of these transfers clearly were made "shortly after" Asphalt Trader's claim arose, the vast majority surely did not.

---

[3] Asphalt Trader also argues that Taryn failed to pay its debts as they became due because it owed a substantial amount of money to *Mr. Beall* that was not repaid within three years as required by Taryn's Operating Agreement. But as already explained, Mr. Beall plainly did not hold Taryn to the requirements of interest and prompt repayment set forth in that agreement. To the contrary, the Defendants' course of dealing suggests that they treated the loans from Mr. Beall to Taryn as payable upon demand. And given that Mr. Beall controlled the timing and amount of Taryn's repayments, the court cannot say that Taryn failed to repay its debts to Mr. Beall *as they became due*.

Even with respect to the transfers made shortly after the claim arose, moreover, the court concludes that, on the facts presented here, this badge of fraud largely overlaps with Utah Code § 25-6-5(2)(d)—whether the debtor was sued or threatened with suit before an obligation was incurred.

The court thus finds that this badge of fraud provides only marginal support for Asphalt Trader's claim.

## II.

Because the UFTA's enumerated badges of fraud are nonexclusive, the court will now address other non-statutory factors that may support or undermine Asphalt Trader's claim and were raised by the parties or are apparent from the evidence.

### A.

The court will begin its analysis of these non-statutory factors by considering the overall pattern of Defendants' conduct. Several aspects of this pattern are quite striking.

First, this is not a case in which a debtor abruptly attempted to dispose of all or most of its assets upon learning of a potential or actual liability. To the contrary, Taryn did not suddenly transfer large amounts of money to Mr. Beall or anyone else at any point between when Asphalt Trader's claim arose and the initiation of this lawsuit. It did not do so after first being threatened with suit, after arbitration proceedings began, after the arbitrators entered an award against Taryn, or after Mr. Beall learned of Cinque Terre's bankruptcy proceedings. Rather, Taryn gradually depleted all of the funds in its bank accounts through a legion of "individual transfers . . . for relatively small amounts [that] continued for more than four-and-a-half years." 56(g) Order, Dkt. No. 185 ¶ 12; *see also* Findings of Fact 57–58.

26

Second, the course of dealing between Taryn and Mr. Beall was remarkably consistent throughout this entire period. As this court previously explained,

> Defendants engaged in the type of dealing here, Mr. Beall depositing his income from outside sources into Taryn's checking accounts and Taryn paying many of Mr. Beall's personal expenses from that account, on a remarkably consistent basis for almost five years, from January 3rd, 2012, through December 31st, 2016.
>
> For most of this period, Mr. Beall deposited his outside income into Taryn's accounts and Taryn paid Mr. Beall's personal expenses, and the amounts deposited by Mr. Beall and the amounts paid by Taryn were generally consistent.
>
> . . . .
>
> After June 2016, Mr. Beall no longer deposited his outside income directly into Taryn's accounts but instead paid Taryn's legal bills from the arbitration out of his personal accounts.

56(g) Order, Dkt. No. 185 ¶¶ 1–2, 4; *see also* Findings of Fact 13–14, 60.

The course of dealing between Taryn and Mr. Beall thus appears to have predated the dispute with Asphalt Trader and to have followed a largely consistent pattern even as Taryn's legal exposure increased. It did not change in any substantial way when the contract was breached, when Asphalt Trader threatened suit, when Asphalt Trader initiated arbitration proceedings, when the arbitration award was entered against Taryn, or even when Mr. Beall learned of Cinque Terre's bankruptcy proceedings. Indeed, the evidence presented at trial overwhelmingly corroborates Mr. Beall's testimony that Taryn and he did not significantly deviate at any time from their "normal course of business." Finding of Fact 13.

Third, Mr. Beall deposited large amounts of personal and family money to which Taryn had no claim into Taryn's bank accounts, and he also paid for many of Taryn's business expenses—including substantial legal fees relating to the arbitration—from his personal accounts. Indeed, although Taryn spent nearly $1.9 million for Mr. Beall's benefit after the

controversy with Asphalt Trader arose in 2012, Mr. Beall provided Taryn more than $1.7 million during the same period. *See* Findings of Fact 58, 60.

Mr. Beall continued to use his own money for Taryn's benefit even as Taryn's legal exposure increased and even as Taryn's payments on his behalf decreased. He provided Taryn $121,271 after the arbitration award in February 2016, while Taryn paid $103,529 for his benefit after this date. *See* Findings of Fact 59, 61. He paid $49,390 on Taryn's behalf after the order for relief in bankruptcy was entered for Cinque Terre in June 2016, even though Taryn spent less than half of that amount—$22,834—for his benefit after this date. *See id.* And he paid $21,931 for Taryn after learning of Cinque Terre's bankruptcy in early December 2016, while Taryn paid less than a quarter of this amount—$5,177—on his behalf after that date. *See id.*

Fourth, if Defendants' intent was to defraud Asphalt Trader, their actions were remarkably inartful. To take just one example: after the arbitration award was entered against Taryn, Defendants could have exhausted Taryn's remaining bank account balances simply by paying Taryn's outstanding legal fees relating to the arbitration—an indisputably legitimate business expense—from those accounts. *See* Findings of Fact 58–61. Instead, Taryn continued to pay for Mr. Beall's personal expenses from its bank accounts, and Mr. Beall paid Taryn's legal fees from his personal accounts. *See id.*

The court finds that each of these aspects of Defendants' overall pattern of conduct is very difficult to square with actual intent to hinder, delay, or defraud Asphalt Trader. If Defendants' intent was to prevent Asphalt Trader from collecting damages from Taryn, it is difficult to understand why they would not have depleted its assets more quickly—let alone why they would have put vast sums of Mr. Beall's personal funds at risk by depositing them into Taryn's bank accounts.

To the contrary, Defendants appear to have acted as if they were completely unconcerned with—and perhaps even oblivious to—Taryn's potential liability to Asphalt Trader.

**B.**

There were in fact understandable reasons why Defendants would not have been particularly concerned with Taryn's potential liability.

First, "[a]t the time that almost all of the challenged transfers were made, Taryn had a claim against Cinque Terre that was more than adequate to offset Asphalt Trader's claim against Taryn." 56(g) Order, Dkt. No. 185 ¶ 10; *see also* Finding of Fact 37.

In addition, Mr. Beall testified that under the parties' previously established course of dealing, Taryn never paid Asphalt Trader before receiving payment from the sub-charterer. *See* Finding of Fact 22.

Finally, during settlement discussions, Asphalt Trader appears to have blamed Cinque Terre—not Taryn—for the breach that occurred in Venezuela. *See* Finding of Fact 34. Indeed, in one conversation, the owner of Asphalt Trader, Elias Gotsis, reassured Mr. Beall by stating: "this is not your problem, you are not at fault here. We'll get this straight." *Id*. And consistent with its stated view that Cinque Terre was the party at fault, Asphalt Trader appears to have negotiated directly with Cinque Terre in its attempts to resolve the dispute. *See id*.

**C.**

Asphalt Trader argues that Mr. Beall's "transfer of his personal property to asset protection trusts and an offshore LLC in 2016 around the time the London arbitration award and the Taryn judgment were entered is strong circumstantial evidence that Beall acted with actual intent to hinder, delay, or defraud Asphalt." Dkt. No. 196 at 38.

These transactions do appear to be designed, at least in part, to protect Mr. Beall's assets from his creditors. But the assets protected by these trusts belong to Mr. Beall personally—not Taryn. And Asphalt Trader's claim for breach of contract was against Taryn—not Mr. Beall.

Moreover, under the UFTA, "[a] settlor's expressed intention to protect trust assets from the settlor's potential future creditors is *not* evidence of an intent to hinder, delay, or defraud a known creditor." *Id.* § 25-6-14(5)(j) (emphasis added).

For both reasons, while these transactions may well provide circumstantial evidence of Mr. Beall's intent to prevent *his* creditors from accessing his personal wealth, the court cannot say they evidence an intention to hinder, delay, or defraud *Taryn*'s creditors.

In all events, the court credits Mr. Beall's testimony that he decided to restructure his estate in 2014 after dealing with problems that arose when his mother and sister passed away intestate or with very little estate planning, and that he made the questioned transactions when his own health began to falter, not in response to the arbitration award against Taryn. *See* Finding of Fact 68.

### D.

Finally, Asphalt Trader argues that "clear and convincing evidence demonstrates Beall's operating of Taryn's accounts was not a series of loans and loan repayments, but simply co-mingling of his personal assets with Taryn's." Dkt. No. 196 at 45.

Defendants and their accountant produced evidence and testimony at trial, however, that they kept sufficient records to distinguish Taryn's business expenses from its loan repayments, to track the balance of loans and repayments between Taryn and Mr. Beall, and to distinguish the two Defendants' respective assets. *See* Findings of Fact 5–7, 17. They also kept sufficient records to file tax returns that were audited and approved without changes by the IRS. *See*

Finding of Fact 8. While Defendants' financial course of dealing may have been informal and even sloppy, the court is not persuaded that it amounted to "comingling" in a legal sense.

Regardless, the UFTA "provides a remedy for creditors who are actually harmed when a debtor transfers property; it does not provide a remedy in cases of only theoretical harm." *Rupp v. Moffo,* 358 P.3d 1060, 1064 (Utah 2015). And here, it is not clear how any of the alleged comingling could have harmed Asphalt Trader.

Asphalt Trader freely chose to enter into a contractual relationship with Taryn, a limited liability company organized under Utah law. Although Utah's laws and Taryn's Articles of Organization provided notice that Taryn's need not maintain capital in excess of its member's initial required capital contribution, Asphalt Trader neither demanded nor received a personal guaranty of Taryn's performance from Mr. Beall.

The court finds that had Mr. Beall *not* deposited any of his personal funds into Taryn's accounts or paid for any of Taryn's business expenses from his personal funds, and had he distributed Taryn's remaining profit to himself after paying taxes each year, Taryn's bank accounts would have been depleted much earlier. To allow Asphalt Trader to recover from Mr. Beall because of Defendants' idiosyncratic business practices would thus give Asphalt Trader a windfall—a personal guaranty for which it neither contracted nor paid.

\*     \*     \*

After carefully weighing both the enumerated and non-statutory badges of fraud, the court concludes that Asphalt Trader has failed to prove by clear and convincing evidence that Defendants acted with actual intent to hinder, delay, or defraud.

The court will accordingly enter judgment in favor of Defendants on Asphalt Trader's

remaining claim.[4]

Dated this 5th day of August, 2022

BY THE COURT:

_____
Howard C. Nielson, Jr.
United States District Judge

---

[4] In light of the court's ruling, Docket Number 199, Defendants' Motion to Amend/Correct Order, is denied as moot.